Hazel W. Carmichael v. Commissioner. Yvonne E. Martin v. Commissioner. Charlotte L. Bennett v. Commissioner. Richard Webb v. Commissioner. Helen Ann Shaull v. Commissioner.
Hazel W. Carmichael v. Commissioner
Docket Nos. 13336, 13670, 13672, 13673, 13674.
United States Tax Court
1948 Tax Ct. Memo LEXIS 195; 7 T.C.M. (CCH) 278; T.C.M. (RIA) 48080; May 12, 1948
R. G. Epperly, Esq., 728 Woodward Bldg., Washington, D.C., and Arthur H. Ford, Esq., for the petitioners. James C. Maddox, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The Commissioner determined deficiencies in income tax in the above cases and for the years as follows: Docket
No.
Petitioner
1943
1944
13336
Hazel W. Carmichael
$36.56
13670
Yvonne E. Martin
$ 42.20
13672
Charlotte L. Bennett
83.00
13673
Richard Webb
125.00
13674
Helen Ann Shaull
144.67 These cases were consolidated *196 for hearing and opinion. The question involved is as to whether or not the value of living quarters occupied by each of the petitioners during the taxable year involved constituted taxable income. Findings of Fact All of the petitioners herein are residents of Washington, D.C. and filed their returns for the taxable year involved with the collector of internal revenue for the district of Maryland at Baltimore, Md.
Petitioners were all employees at McLean Gardens which was one of 26 projects of the Government's housing program. While so employed petitioners occupied rooms in said McLean Gardens but in their income tax returns they reported income only to the extent of the cash salary received. McLean Gardens was constructed and operated through the Defense Homes Corporation, a Maryland corporation, all of the stock of which was owned by the United States Government. McLean Gardens consisted of 43 buildings, 9 of which were dormitories, three for men and six for women, each of 140 rooms. The funds for the operation of McLean Gardens were supplied by the United States Government through Defense Homes Corporation. The rents received from McLean Gardens were deposited immediately *197 to the account of the United States. The United States Government, through Defense Homes Corporation, fixed the rent and determined and controlled all expenditures, including wages and salaries. The rental value of all rooms occupied by McLean Gardens' employees was charged to expense and credited to income by journal entries each month. When petitioners were employed they were informed by the manager of McLean Gardens that they would not pay income tax on the value of the rooms which they occupied. During the taxable years the McLean Gardens apartments were in process of construction and organization. The United States was engaged in intensive war and industrial activity. The manager of the apartment had great difficulty in procuring suitable, reliable employees due to Federal control over employment and wages. The manager required all floor managers in the various apartments and the supervisory personnel to live in the apartment house. The project was large, with approximately 3,500 tenants, many of whom were war workers employed at different times of the day and night and who consequently entered and left the apartment at all hours. The presence of large numbers of single *198 men and women in the different dormitories created managerial problems and it was necessary to have hall managers and supervisory personnel on call at all hours. The hall managers were mostly old women who had been enlisted at the widows' home and whose ages ranged from 67 to 70 years. Wartime transportation, both in transporting these employees from their place of employment late at night and bringing them back to their place of employment in the rush hours in the daytime made their employment at McLean Gardens highly impractical unless they resided on the premises. The inclement weather and poor transportation also made it necessary that elderly women employees be housed on the premises and it was necessary to employ elderly ladies as no other help was available under war conditions. Hazel W. Carmichael This woman was executive housekeeper, supervising 27 maids and 10 housekeepers in 1943 at a time when there was a large turnover of employees. She was required to stay on the project 24 hours a day. Her work was to supervise the maintenance of the rooms, see that the linens were changed, that all toilet facilities were sanitary and in general her duties corresponded to those *199 of a hotel supervisor. On McLean Gardens' books her salary was listed as $2,400 a year which she received in cash. Her apartment was listed on the books as having a rental value of $50 per month. Yvonne E. Martin This woman was assistant manager and was also a registered nurse. She supervised the hall managers of which there were approximately 30. It was her duty to procure relief for any acting hall manager should the subsequent hall manager fail to report for duty. During a flu epidemic she was on constant duty and procured relief nurses. Her most essential time of duty was at the end of the eight-hour shifts but she had some time off during the afternoon. She entered employment in March 1943 at $3,200 per year cash salary. In October 1943 when she occupied an apartment her salary was decreased to $3,000 a year. On May 1, 1944, her salary was increased to $3,200 per year plus her quarters. Her quarters were listed as having a rental value of $17.25 for a two-week period. Her employment required 24 hours a day attendance at the apartments. Charlotte L. Bennett This petitioner was a hall manager and was employed for eight hours of duty out of each 24. She was not required *200 to live at McLean Gardens but the apartment was hers if the desirec it. The exact age of this woman is not in the record but she has the appearance of being elderly. Her hours of service were from 4:00 in the afternoon to 12:00 midnight. On a few occasions when her relief did not appear on time she continued to serve until relieved. Her duties were to hand out the mail, preserve order and supply light bulbs that were burned out. Her cash salary was $1,080 per year. Her apartment had a rental value of $17.25 for a two-week period. Richard Webb This man was employed as a head janitor, entering his employment on March 1, 1943. His supervisory responsibilities extended for 24 hours a day, although he was released for a sufficient time during certain days in the taxable year so that he was enabled to earn, while working for Universal Films, Inc., $682. Under the District of Columbia laws lights were required at all entrances, exits and passage ways which, in the case of McLean Gardens, amounted to several thousand bulbs which had to have constant maintenance. Also, it was Webb's duty to be present in the event of an accident to the plumbing or heating equipment. From August 15, 1943, to *201 January 1, 1944, Webb's pay was $1,800 a year. Beginning in January 1944, $50 a month was deducted from Webb's salary for his apartment rental. Helen Ann Shaull Allison During thte taxable year this woman was unmarried but prior to the hearing she had married and her name was changed to Helen Ann Shaull Allison. She entered employment as assistant auditor in 1943. Her regular hours of employment were from 8:30 a.m. to 5:00 p.m., but because of her responsibility to see that the bookkeepers arrived at a correct balance of the books, she remained on call until ten o'clock at night. She also knew the combination to one of the safes which was occasionally needed after her regular hours of employment had ceased. When she entered employment on March 7, 1943, her salary was $1,800 a year. On May 1, 1944, it was increased to $2,600 a year but the actual value of her apartment was deducted from this cash amount. The apartment occupied by this taxpayer was given a rental value of $36.25 for each two weeks. Opinion The Commissioner, in explaining his determination of deficiencies herein, called attention to a decision of the Comptroller General relating to section 3 of the Act of March 5, 1928 (45 *202 Stats. 162), [1] in which decision it was held: "* * * that the reasonable value of the allowances furnished in kind shall be determined and considered as a part of the compensation * * * whenever or wherever allowances, in kind, including quarters, heat, light, etc., are furnished to civilian employees." The petitioners herein contend that the managers of defense housing projects are independent contractors and that since they are employees of independent contractors, the decision of the Comptroller General does not apply to them. In support of their claim to being employees of independent *203 contractors, petitioners cite certain statements of the Commissioner in letters to the project managers that managers of defense housing projects are independent employers for the purpose of collecting income tax at the source on wages, deducting Federal insurance contributions, and Federal employment taxes. It is to be noted that these comments of the Commissioner, even if they were accepted as authority, do not designate the project managers as employers for any other purpose than those purposes named in the letters. On the other hand, section 1621, I.R.C. defines an employer generally as one who directs the employment and pays the wages of the employee but if these two functions are not done by the same person, then the employer is the one who controls the payment of the wages. We are therefore unable to support petitioners' contention that they were employees of independent contractors. However, if we were to agree with petitioners in this respect we could not support the additional contention that thereby the reasonable value of petitioners' living quarters would ipso facto be excludible from their respective taxable income. Section 29.22 (a)-3 of Regulations *204 111 has been of long standing and it applies to all taxpayers. It says in part: "* * * If a person receives as compensation for services rendered a salary and in addition thereto living quarters or means, the value to such person of the quarters and meals so furnished constitutes income subject to tax. If, however, living quarters or meals are furnished to employees for the convenience of the employer, the value thereof need not be computed and added to the compensation otherwise received by the employees." "Convenience of the employer" has been generally heretofore interpreted as meaning not merely the request, direction or pleasure of the employer but that the inherent nature of the employment requires that the employee occupy premises supplied by the employer, in which the occupation of the designated quarters becomes an inherent part of the services performed. Under such circumstances the rental value of the quarters occupied is not included in the employees taxable income. However, if living in the supplied quarters is not an essential element of the taxpayer's employment, even though such occupancy may be requested by the employer, and convenient to the employer, the rental *205 value of the occupied quarters becomes a part of the employees taxable income. Thus, in Arthur Benaglia, et al., 36 B.T.A. 838, a hotel manager constantly on duty of necessity lived at his place of employment. The value of his quarters was not included in his taxable income. However, in Herman Martin, 44 B.T.A. 185, the Board of Tax Appeals refused to allow a radio operator, living and working on a dredge, whose duties required him to be on the job 24 hours a day, to exclude the value of his meals and lodging from his taxable income because it appeared that the employer did not furnish such meals and lodging gratuitously but charged the taxpayer therefor $40 a month. In Olin O. Ellis, 6 T.C. 138, this Court held that only such portion of the rental value of an apartment occupied by a night manager of an apartment house as was necessary to supply suitable accommodations for a night manager would be deductible from such employee's taxable income. In this case the employee occupied an apartment of greater size than the nature of his work required and the remainder of the rental value of the taxpayer's apartment over the rental value of one *206 which would ordinarily be occupied by a night manager. Based upon the foregoing decisions it is our conclusion that Hazel W. Carmichael worked under conditions which required her, as a part of her employment and for the convenience of her employer, to be on duty at McLean Gardens 24 hours a day and, while she received a salary of $2,400 a year plus her apartment, there is nothing in the record to show that anything was deducted from her salary to pay for the apartment and therefore as to this petitioner we find for the taxpayer. In the case of Yvonne E. Martin, the nature of her duties would indicate a probability of the necessity of her presence at her place of employment throughout the 24 hours. However, it appears that she worked for a considerable part of 1943 without residing at the apartment, and that from October 1943 until May 1944 she was charged $200 per month for her apartment. We are unable to conclude that because her cash income was increased in May 1944 to $3,200 a year there was not still some charge for her apartment. She did not testify and the presumption is in favor of the Commissioner's findings. We therefore find for the Commissioner. In the case of Helen *207 Ann Shaull Allison the record shows that when her salary was fixed at $2,600 there was a deduction taken therefrom for her living quarters. Furthermore, she was a young woman who had no handicaps requiring her residence in the apartment and, while there is some evidence that she remained subject to call for six hours in addition to her regular eight hours of employment, we do not find that the nature of her work required her residence in the apartment. As to this taxpayer we find for the respondent. In the case of Charlotte L. Bennett, an elderly woman having a tour of duty begining at four in the afternoon and ending at twelve, midnight, with the responsibility of serving until her relief appeared ready for work, because of her advanced years and the practical impossibility of getting to and from her employment, as well as the necessity of her remaining on call in the event of administrative difficulties, it is our conclusion that her residence in the apartment was a necessary part of her employment and that the rental value of her apartment is excludible from her income. In this case we find for the taxpayer. Richard Webb's duties as a head janitor would ordinarily require 24 *208 hours service and that the rental value of the apartment be excluded from his income but in this case we find that $682 of his income came from employment outside of McLean Gardens and also that from August 15, 1943, to January 1, 1944, his pay at McLean Gardens was $1,800. Beginning with January 1944, however, there was deducted from Webb's salary $50 a month to cover the rental cost of his living quarters. Under the decision in the Herman Martin case, supra, we hold that the value of his living quarters is a part of his taxable income and we find for the Commissioner in this case. These cases all present unfortunate situations inasmuch as the petitioners were all induced to accept employment on the representation that the value of their rental quarters would not be subject to tax. However, the apartment managers, by such statement, could not control the operation of the Federal income tax law. Decision will be entered for the petitioner in Docket Nos. 13336 and 13672, and for the respondent in Dockets 13670, 13673 and 13674. Footnotes
1. SEC. 3. The head of an executive department or independent establishment, where, in his judgment, conditions of employment require it, may continue to furnish civilians employed in the field service with quarters, heat, light, household equipment, subsistence, and laundry service; and appropriations for the fiscal year 1929 and thereafter of the character heretofore used for such purpose are hereby made available therefor: Provided, That the reasonable value of such allowances shall be determined and considered as part of the compensation in fixing the salary rate of such civilians.↩